## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

PAMELA FAYE HARRIS,       )
                                  )
        **Plaintiff,**       )
                                  )
                                  )     **No. 3:12-00806**
**v.**                             )     **Judge Nixon/Brown**
                                  )
MICHAEL J. ASTRUE,        )
COMMISSIONER            )
OF SOCIAL SECURITY,      )
                                  )
        **Defendant.**     )

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d), and  Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*.  For the reasons explained below, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the record (Doc. 14) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

## I.  PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on November 5, 2008, and for SSI on October 23, 2008, alleging a disability onset date of October 23, 2007 as to both claims, amended subsequently to April 1, 2008.  (Doc. 10, pp. 14, 44, 124-36, 145-46)  Plaintiff listed the following conditions that limited her ability to work: Bell's Palsy, sleep apnea, bladder problems, fatigue, bipolar disorder, depression, memory problems, paranoia, and hearing voices.  (Doc. 10, pp. 69, 71, 157)  Plaintiff's claims were denied on January 5, 2009, and again upon reconsideration on April 15,

2009. (Doc. 10, pp. 66-81)

Plaintiff filed a request for a hearing before an Administrative Law Judge (ALJ) on June 6, 2009. (Doc. 10, p. 82) A hearing was held on November 30, 2010 before ALJ Ronald E. Miller. (Doc. 10, pp. 33-65, 93-97) Vocational Expert (VE) Gary K. Sturgill, Ph.D., testified at the hearing. (Doc. 10, pp. 59-64, 111-12)

The ALJ entered an unfavorable decision on December 16, 2010, holding that plaintiff had not been under a disability as defined under the Act from April 1, 2008 through the date of the decision. (Doc. 10, pp. 11-32) Plaintiff filed a request with the Appeals Council on February 18, 2012 to review the ALJ's decision. (Doc. 10, pp. 7-10) The Appeals Council denied plaintiff's request on June 6, 2012, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 10, pp. 1-6)

Plaintiff through counsel brought this action on August 3, 2012 seeking judicial review of the Commissioner's decision. (Doc. 1) Thereafter, plaintiff filed a motion for judgment on the administrative record on January 4, 2013. (Doc. 14) The Commissioner responded on April 5, 2013. (Doc. 17) The plaintiff filed a reply on April 25, 2013. (Doc. 20) This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Medical Evidence

The medical evidence of record reveals that plaintiff was seen by numerous healthcare providers for an assortment of complaints, both physical and mental/psychological. The evidence summarized below has been tailored to plaintiff's claims of error.

Plaintiff was seen at the Centennial Medical Center (Centennial) Emergency Department (ED) on September 12, 2009, at which time she was diagnosed with acute severe anxiety and acute

depression. (Doc. 10, pp. 390-91) On November 26, 2009, plaintiff was diagnosed at the Centennial ED with acute severe anxiety. (Doc. 10, pp. 388-89) On May 11, 2010, plaintiff was diagnosed at the Centennial ED with acute chronic back pain, the attending physician also noting that plaintiff was "ambulatory in the [examining] room without difficulty." (Doc. 10, pp. 384-86)

Plaintiff was treated at the Nashville General Hospital (Nashville General) ED for joint pains and headaches on July 15 and 18, 2008. (Doc. 10, pp. 226-41) Plaintiff was assessed with and treated for the following: migraine headaches, and "mild findings of a right Bell's palsy" with no evidence "of tremor, fasciculations,[1] or uncontrolled movement disorder." (Doc. 10, pp. 227-28, 230, 236-37) An x-ray of the cervical spine on July 18, 2008 was generally unremarkable. (Doc. 10, pp. 228, 231) Plaintiff presented at Nashville General ED again on October 30, 2009 and September 4, 2010. (Doc. 10, pp. 428-43) Plaintiff was treated for anxiety during her October 2009 visit. (Doc. 10, p. 435) Plaintiff was diagnosed with "mild right knee pain" during her September 2010 visit, at which time she also was deemed to have had a "[n]ormal psychiatric evaluation." (Doc. 10, pp. 432, 435)

Plaintiff received treatment from the Metro Center Healthcare Group (Metro Healthcare) during the period August 16, 2005 to February 12, 2009. (Doc. 10, pp. 243-58, 374-76) It was during this period that plaintiff first complained of back pain in December 2005 following a motor vehicle accident on November 17, 2005. (Doc. 10, pp. 251-53) Plaintiff subsequently described her back pain to Metro Healthcare as "stable" on May 7, 2007, denying any back pain at all on July 21, 2008. (Doc. 10, pp. 243, 248) Plaintiff also presented to Metro Heathcare for anxiety, depression, migraine headaches, and Bell's Palsy. (Doc. 10, pp. 243, 247) Plaintiff reported to the medical staff

---

[1] Fasciculation – "a small local contraction of muscles, visible through the skin . . . ." *Dorland's Illustrated Medical Dictionary* 682 (32nd ed. 2012).

at Metro Healthcare that her anxiety/depressive disorder was relieved by medication, but that her "poor compliance with medications" aggravated her condition. (Doc. 10, pp. 247, 249) Dr. Carolyn Lightford, M.D. determined on July 21, 2008 that plaintiff did "not appear to have Bell's Palsy. . . ." (Doc. 10, p. 245)

Plaintiff was treated at Centerstone Community Mental Health (Centerstone) during the period May 7, 2007 through December 8, 2008. (Doc. 10, pp. 260-318, 377-83) A clinically related group (CRG) assessment completed at intake on May 7, 2007 based on Plaintiff's subjective complaints reflects that plaintiff had "marked" to "moderate" functional impairments in two of the four areas rated, that she was classified as "Group 1," *i.e.*, a person with severe and persistent mental illness,[2] and that she had a Global Assessment of Functioning (GAF) score of 60.[3] (Doc. 10, pp. 263-65, 276-82) Diagnosed with bipolar disorder at intake (Doc. 10, pp. 277-79), plaintiff missed 3 of the next 4 appointments (Doc. 10, pp. 313-16). On the physical side, plaintiff denied any back or spine related impairment in the clinical intake assessment. (Doc. 10, p. 278) A service termination report dated September 20, 2007 shows that plaintiff's care at Centerstone was "terminated" for failure to show up for appointments for a period of 3 months. (Doc. 10, pp. 267-68)

Another CRG form completed at Centerstone more than a year later during a second intake assessment on June 16, 2008, again based on plaintiff's subjective input, shows that plaintiff had

---

[2] The Magistrate Judge notes that the answer to question 15 in the CRG, *i.e.*, "duration," is predicated on a determination that the areas assessed accumulate for "a total of one year duration of longer." (Doc. 10, ¶ 15, p. 264) As this was an initial intake assessment (Doc. 10, ¶ 19.15, p. 265), the duration known to the evaluator would have been, by definition, less than one year. Moreover, for someone to be assigned to Group 1, the duration of that person's severe impairment must "total[] six months or longer of the past year ('Yes' on question # 15)." Again, the evaluator would not have had this information, except as provided by plaintiff during the initial intake interview.

[3] The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas. *See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994).

improved to "moderate" functional impairments in all four of the areas rated, but that she still was classified as "Group 1," and her GAF score had dropped to 50. (Doc. 10, pp. 263-65, 269-75) Again diagnosed with bipolar disorder at intake (Doc. 10, p. 305), plaintiff missed five of her next seven appointments (Doc. 10, pp. 293-95, 301, 307). Dr. John Pate, M.D., who conducted a psychiatric evaluation on intake "did not have an opinion about Bipolar I Disorder, a diagnosis that she ha[d] been given in the past." (Doc. 10, p. 292) Plaintiff again denied any back or spine related impairment in the clinical intake assessment. (Doc. 10, p. 271) A service termination report was issued on February 23, 2009 noting plaintiff's lack of progress and failure to complete treatment. (Doc. 10, pp. 377-780)

The opinion of Dr. Stephen Burge, M.D., a state agency consultant physician, wrote a report on December 10, 2008 pertaining to plaintiff's bipolar depression, Bells Palsy, and sleep apnea claims. (Doc. 10, pp. 319-20) Dr. Burge rated plaintiff as "non-severe." (Doc. 10, p. 320) Noting that plaintiff had limited support pertaining to her Bell's palsy claim, and no support pertaining to her sleep apnea claim, Dr. Burge concluded that plaintiff's claims are only partially credible. (Doc. 10, p. 320)

Michael Hammonds, Ph.D., conducted a mental residual functional capacity assessment on January 5, 2009. (Doc. 10, pp. 321-35) Dr. Hammonds determined that: 1) plaintiff's understanding and memory limitations, sustained concentration and persistence, social interaction, and adaptation limitations ranged from not significant to moderate; 2) plaintiff could not complete detailed tasks, but she could complete simple tasks with no limits; 3) contact with coworkers and the general public should be "casual"; 4) supervision should be direct but not confrontational; 5) changes in her environment should be infrequent and gradual; 6) her functional limitations were generally moderate. (Doc. 10, pp. 321-22) Dr. Hammonds also noted that plaintiff had a "long" history of

noncompliance" with treatment, that she was not a reliable historian, that she was not "fully cooperative" in his assessment, that "her self-report [wa]s not consistent," and that "marked" restriction in functioning could not be established "due to [plaintiff's] lack of adequate cooperation." (Doc. 10, p. 334)

Plaintiff received treatment at Lifecare Family Services (Lifecare) from July 12, 2004 through August 16, 2010. (Doc. 10, pp. 338-72) Plaintiff was terminated at least once for noncompliance on March 4, 2005. (Doc. 10, pp. 338, 364) A "reintake" was completed at Lifecare 20-plus months later on January 24, 2007. (Doc. 10, p. 367) Another "reintake" was completed on August 27, 2008. (Doc. 10, pp. 364-66) Although Lifecare diagnosed plaintiff with Bipolar II disorder throughout her course of treatment, and a GAF score ranging from 43 to 48, there is nothing in the record to show that these determinations were based on anything other than plaintiff's subjective complaints. Plaintiff was seen at Lifecare almost weekly from April 2, 2009 until August 16, 2010. (Doc. 10, pp. 444-85) Plaintiff's GAF score varied widely during this period from a low of 39 to a high of 59, for which no explanation can be gleaned from the record. Plaintiff was a no-show more than half the time during this period, and a plain reading of those appointments that she did keep is that the clinical observations reported were based solely on plaintiff's subjective complaints.

On March 13, 2009, Dr. Joe Allison, M.D., affirmed Dr. Burge's December 10, 2008 report as written. (Doc. 10, p. 336)

On April 11, 2009, Rebecca Joslin, Ed.D., Ph.D., affirmed Dr. Hammond's January 1, 2009 report as written. (Doc. 10, p. 373)

Records from Medical Necessities for the period July 15, 2009 through October 6, 2010 (Doc. 10, pp. 486-563) show that plaintiff was seen numerous times by her primary care physician,

Dr. Michael Rhodes, M.D. (Doc. 10, pp. 486-95, 497, 503-04, 519-22).[4]  Dr. Rhodes's clinical reports during this time make frequent reference to lower back and knee pain based solely on plaintiff's subjective complaints.  Records from Medical Necessities show that plaintiff was referred to Skyline Outpatient Diagnostic Center (Skyline Diagnostic) for an x-ray of the lumbar spine.  (Doc. 10, p. 494)  Although it cannot be determined from the record the actual date that plaintiff was referred to Skyline Diagnostic, an x-ray made by Skyline Diagnostic on June 1, 2009 revealed "subtle levo [*sic*] curvature within the lower lumbar region with multilevel lumbar spondylosis."[5] (Doc. 10, p. 554)  Records provided from Medical Necessities also show that x-rays were made of both plaintiff's knees at Skyline Medical Center (Skyline) on June 1, 2009 with "no acute abnormality" noted in either knee (Doc. 10, pp. 552-53), and that an MRI was made of plaintiff's left knee at Skyline on October 19, 2009 the results of which were "normal" (Doc. 10, p. 551).

Dr. Rhodes referred plaintiff to Dr. Steven Larson, M.D., at American Orthopedics & Sports Medicine (American Orthopedics) 3 times during the period June 21 to August 2, 2010.  (Doc. 10, pp. 394-418)  On June 21, 2010, Dr. Larson diagnosed plaintiff with bursitis of the right hip, noting at the same time that she had a "normal hip joint" with "no acute pathology."  (Doc. 10, p. 409) Plaintiff presented to Dr. Larson on June 24, 2010 for right knee pain.  (Doc. 10, pp. 401-08)  Dr. Larson determined based on  examination and radiological imaging that both of plaintiff's knees were normal.  (Doc. 10, p. 403)  Plaintiff presented to Dr. Larson on August 2, 2010 again complaining of right knee pain.  (Doc. 10, pp. 394-400)  Again, Dr. Larson determined based on examination and radiological imaging that both of plaintiff's knees were normal, and cleared her to

---

[4]  Dr. Rhodes also  is identified as either the referring physician or primary care physician in 9 other medical records before the court.  (Doc. 10, pp. 418, 439, 441-43, 505-08, 511, 550, 552, 554, 559)

[5]  Spondylosis – "degenerative spinal changes due to osteoarthritis."  *Dorland's* 1754.

return to work that same date. (Doc. 10, pp. 395, 400)

On August 27, 2010, Claudia Mays, a licensed clinical social worker and mental health treatment specialist,[6] completed a medical source statement of ability to do work-related activities (MSS) (mental). (Doc. 10, pp. 419-21) Although there is no indication there was a treatment relationship between Ms. Mays and plaintiff, Ms. Mays assessed plaintiff with "marked" limitations in every mental/psychological category evaluated.

On August 31, 2010 Dr. Rhodes completed an MSS (physical). (Doc. 10, pp. 422-27) Dr. Rhodes assessed plaintiff with the following: 1) able to lift and/or carry a maximum of 20 pounds 1/3 of the time (occasionally) during a normal 8-hour workday, but unable to lift or carry anything heavier at any time; 2) able to sit for 30 minutes, stand for 20 minutes, and walk for 15 minutes without interruption, the same sitting/standing/walking limitations applicable to an 8-hour workday; 3) medically necessary to use a cane to ambulate more than 30 ft., but able to use the free hand to carry small objects; 4) able to use either hand occasionally during an 8-hour workday; 5) able to use either foot occasionally during an 8-hour workday; 6) able to climb stairs, ramps and/or balance occasionally during an 8-hour workday, but never able to climb ladders or scaffolds, stoop, kneel, crouch, or crawl; 6) able to operate a motor vehicle and/or be exposed to humidity and wetness occasionally, but never to be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, cold heat, and/or vibrations; 7)"library" quiet environment required; 8) unable to walk a block or handle paper/files, but no other limitations on daily living activities. The limitations above all were attributed solely to lumbar degenerative disc disease and/or degenerative

---

[6] Ms. Mays is identified in connection with only two medical records before the court. (Doc. 10, p. 245, 295) The first is a referral in connection with plaintiff's July 21, 2008 visit to Metro Center when she complained of Bells Palsy and migraine headaches. The second is in connection with an August 21, 2008 notation that plaintiff was a no-show for her appointment for psychiatric treatment at Centerstone. Unable to determine from the record for whom Ms. Mays worked, the Magistrate Judge relies on plaintiff's representation that she was employed by Lifecare.

joint disease of the knees. Dr. Rhodes did not "[i]dentify the particular medical or clinical findings (i.e., physical exam findings, x-ray findings, laboratory test results, history, and symptoms including pain, etc.) which support[ed] his assessment or any limitations and why the findings support[ed] the assessment" as required by the form MSS that he completed.

## B. Transcript of the Hearing

As previously noted above at p. 2, the hearing before the ALJ took place on November 30, 2010 in Nashville. The hearing began at 10:40 a.m. and ended more than an hour later at 11:47 a.m. (Doc. 10, pp. 35, 65) Counsel amended plaintiff's alleged disability onset date to April 1, 2008 at the hearing. (Doc. 10, p. 45)

Under questioning by the ALJ, plaintiff testified that she had last worked as a technician in a nursing home, but was fired after arguing with a nurse. (Doc. 10, pp. 45-46) She testified that her income was limited to a welfare check, food stamps, and two checks from Aid to Families with Dependent Children (AFDC). (Doc. 10, pp. 46-47) Plaintiff testified that foreclosure proceedings were underway on her home. (Doc. P. 47)

Plaintiff testified that she had to quit physical therapy because the therapy was "aggravating [her] joints." (Doc. 10, p. 48) When asked to identify the "major . . . problem that ke[pt] her from working," plaintiff replied that her limitations were both physical and mental, but that pain was the number one problem. (Doc. 10, p. 49) Plaintiff attributed her pain to her knees, hip, and lower back. (Doc. 10, pp. 49-50) The ALJ then inquired into the medication that plaintiff was taking for her back, to which plaintiff replied that she was taking Ultracet, Somas, Lyrica, and morphine. (Doc. 10, p. 51)

When asked what her number two problem was, plaintiff replied "I cry all the time" due to depression. (Doc. 10, p. 52) When asked what her number three problem was, plaintiff claimed that

her head hurt, she would get paranoid, and feel like she had to stay in the house.  (Doc. 10, p. 52)

When asked if she had a fourth problem that kept her from working, plaintiff replied that she

sometimes saw things that were not there.  (Doc. 10, p. 53)

On questioning by counsel, plaintiff testified that her back pain originated in her lower back

and spread from there.  (Doc. 10, pp. 53-54)  Plaintiff testified further that a "bare[] touch" could set

it off, and that it just ached.  (Doc. 10, p. 54)

Plaintiff testified that she still had headaches, that she had them two or three times a week,

that she got them when she was stressed, and that they brought "the palsy back."  (Doc. 10, p. 54)

Plaintiff testified that she had to lie down when she had a headache because her vision was blurry.

(Doc. 10, p. 54)

Plaintiff testified to having neck pain "like a pin or something . . . sticking in it, in my

shoulder and all, it hurts me."  (Doc. 10, pp. 54-55)  Plaintiff claimed that she could not turn her

neck from side to side, up or down without pain, and that she could not lift her hand "all the way

up."  (Doc. 10, p. 55)  Counsel then asked plaintiff about her knees to which she replied that

injections helped for about a day.  (Doc. 10, p. 55)

Counsel asked plaintiff if a doctor had prescribed her cane, to which she replied that Dr.

Rhodes had prescribed it to see how it would work.  (Doc. 10, p. 56)  Plaintiff testified that the cane

was "not working too good," so she would have to try something else.  (Doc. 10, p. 56)

Upon continued questioning by counsel, plaintiff testified that she could sit comfortably for

only about ten minutes at a time at which time her back would begin to hurt.  (Doc. 10, p. 56)  When

the ALJ observed that she had been sitting in the hearing for more than 10 minutes, plaintiff replied,

"[y]eah, and I'm moving around too."  (Doc. 10, p. 56)  When asked how long she could stand,

plaintiff testified that "[i]t really hurts when I stand," but that she could stand for "about ten

minutes." (Doc. 10, p. 56)  When asked about walking, plaintiff testified that she would start hurting and get out of breath in about 15 minutes."  (Doc. 10, p. 56)

Switching to plaintiff's mental health, counsel asked who provided treatment for her. Plaintiff replied that she received mental healthcare from Lifecare, and that they had diagnosed her with bipolar disorder.  (Doc. 10, p. 57)  Plaintiff testified that she experienced daily mood swings, sometimes screamed and hollered, that sometimes she did not know where she was or where she was going, that she saw shadows and heard things, that her paranoia caused her to avoid large groups of people.  (Doc. 10, p. 57)  Plaintiff testified that she used to feel some relief by "driv[ing] around in circles," but that she did not do that any more because she was "scared to drive."  (Doc. 10, p. 57)

The ALJ resumed questioning by asking plaintiff if she had problems using her hands.  (Doc. 10, p. 58)  Plaintiff replied that she did, that she had "two braces," but she did not have them on at the time.  (Doc. 10, p. 58)  Plaintiff testified that the braces had been prescribed, that she usually wore them in the daytime, but took them off at night because of swelling.  (Doc. 10, p. 59)

The ALJ turn to the VE and asked him to characterize plaintiff's past relevant work.  The VE testified that plaintiff's job as a nurse assistant was classified as "medium and semi-skilled."  (Doc. 10, p. 60)  The ALJ then posed the following hypothetical to the VE:

> [A]ssume a hypothetical candidate for employment, same age, education and work experience as Ms. Harris.  This individual would be able to lift and carry 20 pounds occasionally, 10 pounds frequently.  Would be able to . . . sit for six hours out of the day, walk and stand for two hours out of the day . . . sitting for 20 minutes, standing for 20 minutes, walking for 15 minutes. . . . [T]he individual would need to alternate sitting and standing at will.  So, whenever . . . [he] . . . had the urge to stand, he could stand . . . for however long, needed; and then sit, walk, whatever is needed . . . . Use of a cane would be medically required, only occasional use of foot controls.  There'd be no climbing of ropes, ladders or scaffolds, no work around unprotected heights, being around moving or dangerous machinery.  As far as the mental limitation, the individual would not be able to complete detailed tasks, but could complete simple tasks with no limits.  Contact with coworkers, general

> public should be casual. Supervision should be direct and non-
> confrontational. Any changes in the work environment, should be infrequent
> and gradually introduced.

(Doc. 10, pp. 61-62)  The VE responded that plaintiff could not perform her past work, but that substantial numbers of jobs existed in the local and national economy at the unskilled sedentary level, *e.g.*, inspectors and sorters, hand packagers, and miscellaneous production workers. (Doc. 10, pp. 62-63)  The VE noted that there were no jobs available based on the opinions of Dr. Rhodes and Ms. Mays in their respective MSS.  (Doc. 10, p. 64)

## C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that she has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that she suffers from a severe medically determinable physical or mental impairment.
>
> Third, if the claimant shows that her impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then she is deemed disabled.
>
> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform her past relevant work, in which case the claimant is not disabled.
>
> Fifth, the ALJ determines whether, based on the claimant's RFC, as well as her age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6ᵗʰ Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6ᵗʰ Cir. 2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6ᵗʰ Cir. 2004). The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6ᵗʰ Cir. 2003).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6ᵗʰ Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253 at *4 (SSA)). In determining the RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6ᵗʰ Cir. 1988).

A review of the record shows that the ALJ complied with the required five-step process. Plaintiff does not allege that he did not.

### III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining

whether the findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *see also Key*, 109 F.3d at 273.

## B. Claims of Error

### 1. Whether the ALJ Erred in Not Giving Proper Weight to the Opinion of Plaintiff's Treating Physician (Doc. 14, pp. 13-17)

Plaintiff argues that the ALJ failed to give Dr. Rhodes's opinion controlling weight as required under the treating physician rule, and that he failed to give a good reason for rejecting Dr. Rhodes's opinions. Plaintiff argues further that the ALJ erred in rejecting the opinions of the state agency medical consultants, and substituting his own RFC determination without regard for the medical opinions of record.

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and the

opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d 365, 376 (6th Cir. 2013)(quoting 20 C.F.R. § 404.1527(c)(2)). However, the ALJ "is not bound by a treating physician's opinions, especially when there is substantial medical evidence to the contrary." *Cutlip*, 25 F.3d at 287. If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. §§ 404.1527(c)(2)-(6)).

The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544)).

The ALJ's discussion pertaining to evidence attributable to Dr. Rhodes is quoted below:

> Opinion evidence regarding the claimant's physical limitations consists of a Medical Source Statement completed by M.A. Rhodes, Jr., M.D., who reported that based on the claimant's lumbar degenerative disc disease and bilateral knee degenerative joint disease, she could lift and/or carry up to twenty pounds occasionally; stand twenty minutes; walk fifteen minutes; and sit for thirty minutes; occasionally perform bilateral reaching, handling, fingering, feeling, pushing, pulling, and operating foot controls; occasionally climb stairs/ramps and balance; never climb ladders/scaffolds, stoop, kneel, crouch, or crawl; occasionally be exposed to operation of motor vehicle, humidity, and wetness; no exposure to unprotected heights, moving mechanical parts; airborne irritants, temperature extremes, or vibration; and

requires a quite (library) noise level. Dr. Rhodes stated that the use of a cane was medically necessary, and the claimant can only ambulate three feet unassisted by a cane. She is able to carry small objects with her free hand while using a cane.

(Doc. 10, p. 21)

Objective evidence has been found to support the claimant's twenty-pound lifting limitation and her need to ambulate while using a cane as opined by Dr. Rhodes. His limitations regarding occasional operation of foot controls, never climbing ladders/ropes/scaffolds, and no exposure to unprotected heights or moving machinery have also been incorporated into the residual functional capacity stated above.

The extreme limitations cited by Dr. Rhodes regarding **standing, walking, and sitting** have been found to be completely unsupported by the objective evidence. Giving some benefit to the claimant's testimony, the undersigned finds that she is limited to standing and/or walking two hours in an eight-hour workday. Likewise, maximum stand, walk, and sit intervals have been established, along with a sit/stand at will option.

Additionally, the undersigned finds no objective evidence to justify the limitations given by Dr. Rhodes regarding only occasional **pushing, pulling, reaching, handling, fingering, feeling, balancing, and climbing ramps/stairs**. Nor is there evidence to support the avoidance of **stooping, kneeling, crouching, crawling, operating vehicles, humidity, wetness, temperature extremes, airborne irritants, vibration, and noise**.

(Doc. 10, pp. 21-22)(internal references to the record omitted)

As to plaintiff's first argument, there is no question that Dr. Rhodes was a treating physician under the treating physician rule and, as such, absent good reason to do otherwise, the ALJ was required to give controlling weight to Dr. Rhodes' opinions. As shown above, the ALJ provided a reason, *i.e.*, the absence of objective medical evidence to support the limitations in bold above. The question then is whether the ALJ's reason for discounting Dr. Rhodes' opinion regarding these limitations was a <u>good</u> one.

As previously noted at pp. 8-9, Dr. Rhodes did not refer to any medical evidence in the MSS

in support of the limitations at issue. He merely made vague notations of lower back pain and/or knee problems as the basis of his opinion pertaining to each of the limitations in bold on the preceding page, including that plaintiff required "library" quiet, and could never be exposed to dust, odors, fumes, and pulmonary irritants due to lower back pain. Given the absence of any supporting medical evidence in his MSS, the court looks to whether there is any objective medical evidence on the record to support the limitations at issue, all of which were based on plaintiff's claims of lower back and knee pain.

The record reveals the following concerning plaintiff's back noted on the following pages in this Report and Recommendation: 1) plaintiff first reported back pain to Metro Healthcare following a November 2005 motor vehicle accident (p. 3); 2) plaintiff described her back pain to Metro Healthcare as "stable in May 2007 (p. 3); 3) plaintiff denied any back or spine related impairments during her first Centerstone clinical intake in May 2007 (p. 4); 4) plaintiff denied any back or spine related impairments during her second Centerstone clinical intake in June 2008 (p. 5); 5) an x-ray made by Skyline Diagnostic in June 2009 revealed "subtle" curvature of the lumbar spine with spinal changes of unspecified severity due to osteoarthritis (p. 7); 6) although diagnosed with chronic back pain in May 2010 based upon plaintiff's subjective representations at the Centennial ED, the attending physician noted that plaintiff was "ambulatory . . . without difficulty" (p. 3); 7) in June 2010, Dr. Larson reported that examination and imaging results revealed that plaintiff had a "normal hip joint" with no "acute pathology"; 8) plaintiff sat for more than 1 hour – from 10:40 a.m. to 11:47 – at the evidentiary hearing (pp. 34, 56, 64); 9) of the many entries in the medical record pertaining to plaintiff's subjective complaints about her back, not once did plaintiff couch those complaints in terms of the limitations at issue.

Turning to plaintiff's knees, imaging in June 2009 at Skyline revealed "no acute abnormality"

in either knee (p. 7), and an MRI of plaintiff's left knee in October 2009 was "normal" (p, 7).

Although plaintiff presented with "mild" knee pain at Nashville General in September 2010 (p. 3),

Dr. Larson determined based on examination and imaging just a couple of months prior, in June

2010, that both of plaintiff's knees were normal (p. 7). Moreover, Dr. Larson, to whom Dr. Rhodes

referred plaintiff for her complaints of knee pain, also determined less than a month before Dr.

Rhodes completed the MSS that both plaintiff's  knees were normal, and he even cleared plaintiff

to return to work (p. 7). Finally, plaintiff <u>never</u> couched her subjective knee complaints in terms of

any of the limitations at issue.

As shown above, objective medical evidence of record that plaintiff actually had a back

problem, much less a disabling one, is virtually nil. As for plaintiff's knees, the objective medical

evidence of record leads to the conclusion that there was nothing wrong with plaintiff's knees at all.

Because the limitations at issue are couched solely in terms of plaintiff's alleged lower back and

knee problems, the ALJ did not err in discounting those limitations owing to the total absence of any

objective medical evidence on the record to support those limitations.

The second part of this claim is plaintiff's allegation that the ALJ also rejected the opinions

of the state agency medical consultants and, having rejected Dr. Rhodes' opinions set forth in the

MSS, that the ALJ "formulated his own RFC finding based upon his own feelings and opinions . .

. ." The state agency medical consultants at issue appear to be Drs. Burge and Allison, discussed at

pp. 5-6.

The relevant portions of the ALJ's decision as it pertains to the state agency medical

consultants are quoted below:

> The record contains opinion evidence from December 2008 wherein state
> agency medical consultant Stephen Burge, M.D., reviewed the evidence and
> found limited support regarding mild facial weakness and no support

regarding allegations of sleep apnea. Therefore, he opined that the claimant
had only non-severe impairments. . . . At the reconsideration level, Joe
Allison, M.D., also reviewed the evidence and stated that the claimant alleged
a new bladder problem; however, no new or recent physical treatment records
were received. He affirmed the initial non-severe rating. . . .

(Doc. 10, p. 17)

As stated above, state agency medical consultants reviewed the evidence and
reported that the claimant's physical impairments are non-severe. . . .
However, new evidence has been admitted into the record since those
opinions were rendered thereby justifying the finding of the severe
impairments listed above. . . .

(Doc. 10, p. 21)

Turning first to the opinions of Drs. Burge and Allison, it is apparent from the portions of
the decision quoted above that the ALJ determined that plaintiff had "severe impairments" based on
"new evidence" in those areas previously reviewed by Drs. Burge and Allison," *i.e.*, plaintiff's
bipolar depression, Bells Palsy, and sleep apnea claims. Drs. Burge and Allison previously found
"non-severe" impairments with respect to those claims. Although the ALJ did not elaborate on the
"new evidence" to which he referred, any error attributable to the ALJ having not been more specific
is harmless because the decision to discount the opinions of Drs. Burge and Allison in favor of the
"new evidence" was to plaintiff's obvious advantage. Even if the ALJ should have evaluated and
discussed the opinions of Drs. Burge and Allison, any error for not having done so is harmless as
well. The opinions of Drs. Burge and Allison concerning plaintiff's claims of bipolar depression,
Bells Palsy, and sleep apnea would not have done anything to rehabilitate Dr. Rhodes' opinions
which, as previously established, were grounded solely in plaintiff's claims of lower back and knee
pain. As previously discussed, the ALJ's decision to discount the limitations in bold on p. 16 is
supported by substantial evidence on the record.

Plaintiff's claim that the ALJ based his decision on "his own feelings and opinions regarding

the Plaintiff's capabilities and limitations without regard to the medical opinions of record" simply does not wash. The law is well established that the ALJ alone weighs the evidence, resolves any conflicts, and makes the determination of disability. *See Richardson*, 402 U.S. at 399-400; *Kalmbach. v. Comm'r Soc. Sec.*, 409 Fed.Appx. 852, 859 (6th Cir. 2011); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 527, 531 (6th Cir. 1997); *Walker v. Sec'y of HHS*, 980 F.2d 1066, 1070 (6th Cir. 1009); *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir.1988). That is precisely what he did, and his decision regarding plaintiff's RFC is supported by substantial evidence on the record..

Plaintiff's first claim of error is without merit.

### 2. Whether the ALJ Misstated the Law and Failed to Give Proper Weight to the Opinion of Plaintiff's Treating Health Care Provider (Doc. 14, pp. 17-21)

Plaintiff argues that the ALJ misstated the law under SSR 06-3p in determining that Ms. Mays's opinion constituted an "unacceptable medical source," by characterizing her opinion as "other evidence" entitled to no weight, for failing to consider and address the factors in SSR 06-3p, and for not giving proper consideration to plaintiff's GAF scores.

"Acceptable medical sources" who can provide evidence to establish an impairment generally include "licensed physicians (medical or osteopathic doctors)" and "[l]icensed or certified psychologist[s]." 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Ms. Mays is neither a physician nor a psychologist. However, "other sources" who may provide evidence under the facts of this case to show the severity of an impairment and how it affects the ability to work would include Ms. Mays who represents herself as a licensed clinical social worth and mental health treatment specialist. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). Under SSR 06-3p, the ALJ is required to consider all relevant evidence in the record, including the opinions of "other sources" such as Ms. Mays.

*Gayheart*, 710 F.3d at 378; *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011).

The factors to be considered in evaluating evidence provided by Ms. Mays include: 1) the examining relationship; 2) the treatment relationship; 3) the length of the relationship; 4) the nature and extent of the treatment relationship;[7] 5) the supportabilty of the opinion; 6) the consistency of the opinion with the record as a whole; 7) specialization; 8) other factors. *Gayheart*, 710 F.3d at 375-76 (citing 20 C.F.R. § 404.1527 and SSR 06-03p). Harmless error may be found, however, where the Commissioner has met the goal of § 404.1527(d) even though he has not complied with the terms of the regulation. *See e.g., Cole*, 661 F.3d 931 at 940.

The ALJ's discussion of Ms. Mays is quoted below:

> In August 2010, licensed clinical social worker Claudia Mays completed a Medical Source Statement and reported that the claimant had marked limitations in the following areas: understand and remember simple and complex instructions; carry out simple and complex instructions; make judgments on simple and complex work-related decisions; interact appropriately with the general public, coworkers, and supervisors; and respond appropriately to usual work situations and to changes in a routine work setting.
>
> Ms. Mays stated that the claimant's bipolar disorder with panic attacks is difficult to control on medication. She has experienced repeated episodes of decompensation over the past twelve months with periods lasting from two to four weeks. Much of her time is spent in bed away from people. Her exacerbation is often precipitated by change in her family system and dealing with the juvenile and adult legal system. She further stated that the claimant experiences periods of paranoia, auditory and visual hallucinations, and symptoms of posttraumatic stress disorder. Due to childhood trauma, she has difficulties maintaining social functioning and does not trust others. The claimant exhibits loss of adaptive functioning and difficulty maintaining social relationships outside of her home. She exhibits short attention span and memory loss, often forgetting appointments and other tasks. Her

---

[7] As previously noted at p. 8 n. 6, it does not appear that a treating relationship existed between plaintiff and Ms. Mays. Therefore, in the universe of those who provide "other evidence," Ms. Mays opinions would be entitled to correspondingly less weight in the same way that the opinions of a nontreating source is given less weight than a treating source.

strengths and periodic boosts in self-esteem are derived from her ability to pay the bills and coordinate her children's affairs mostly by phone. Ms. Mays concludes by stating that the claimant suffered from mental illness for many years while remaining on her job, although she would have to take long breaks from work and then return. She has not been able to return to work since 2008, and she has numerous medical problems.

This Medical Source Statement was submitted by an "unacceptable medical source." As such, those findings are treated as "other evidence" and are given no weight in the process of evaluating opinion evidence received from "acceptable sources." 20 CFR 404.1527. Ms. Mays is a social worker who perhaps may allow empathy for her charges to color her perception of what their limitations are. **That seems to be the situation here as the Ms. Mays opinions aren't supported by the medical evidence of record.**

(Doc. 10, p. 25)(internal references to the record omitted)(emphasis added)

As already noted, Ms. Mays is not a physician or a psychologist, or member of any of the other professions listed in 20 C.F.R. §§ 404.1513(a), 416.913(a). Therefore, the ALJ's characterization of Ms. Mays as an "unacceptable medical source," *i.e.,* not an "acceptable source," is a correct statement of the law under the rules. The ALJ's further characterization of Ms. Mays's opinion as "other evidence" also is a correct statement of the law under 20 C.F.R. §§ 404.1513(d), 416.913(d). The only remaining question is whether the ALJ erred in giving Ms. May's opinion "no weight."

The ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as Ms. Mays. *Cruse*, 502 F.3d at 541 (citing *Walters*, 127 F.3d at 530). The ALJ is, however, required to explain why he gave the weight that he did, in this case "no weight." *Cruse*, 502 F.3d at 541 (citing SSR 06-03P, 2006 WL 2329939 at * 7 (SSA)). The question now becomes whether the ALJ explained why he gave "no weight" to Ms. Mays' opinions.

At first blush, it might appear that the ALJ gave "no weight" to Ms. Mays' opinions because she "[wa]s a social worker who perhaps m[ight] allow empathy for her charges to color her

perception of what their limitations are."  Such an explanation would, in the Magistrate Judge's opinion, be inadequate.  However, as shown in the text in bold above, the ALJ actually gave Ms. Mays's opinions "no weight" because her "opinions [we]ren't supported by the medical evidence of record."  The Magistrate Judge has scoured the medical evidence of record in this case and, although there are volumes of clinical notes recording plaintiff's subjective mental/psychological complaints, the record is utterly devoid of any objective medical evidence that would support any of Ms. Mays' opinions.  Accordingly, the ALJ's decision to give Ms. Mays' opinions "no weight" is supported by substantial evidence – or lack thereof – on the record.

It is apparent from the portions of the ALJ's decision quoted above that the ALJ did not consider each of the factors in SSR 06-3p.  Nevertheless, the Commissioner met the goal of § 404.1527(d), and his decision is supported by substantial evidence on the record.  That the ALJ failed to address each and every one of the factors in the rules in set-piece fashion is harmless error.

Finally, plaintiff argues that the ALJ erred in not considering plaintiff's GAF scores.  A GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009)(internal quotation marks and citation omitted).  A GAF score is not dispositive of disability in and of itself, rather it is significant only to the extent that it elucidates an individual's underlying mental issues. *White*, 572 F.3d at 284; *see also* 65 Fed.Reg. §§ 50746, 50764–65 (2000)("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings.").  Although a GAF score "may be of considerable help to the ALJ in formulating the RFC . . . it is not essential to the RFC's accuracy."  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)(the ALJ's failure to refer to GAF score did not make his RFC analysis unreliable)).  In other words, a GAF score is not "raw medical data" and, as such, GAF scores cannot establish mental

functioning unsupported by substantial evidence. *See Kennedy v. Astrue*, 247 Fed.Appx. 761, 766 (6th Cir. 2007); *see also DeBord v. Commissioner of Social Security*, 211 Fed.Appx. 411, 415 (6th Cir. 2006). Indeed, the ALJ is "**not required to consider . . . GAF scores**." *Keeler v. Comm'r of Soc. Sec.*, 2013 WL 133557 * (6th Cir. Jan. 11, 2013)(citing *Howard*, 276 F.3d at 241)(emphasis added).

Even if the ALJ ought to have considered plaintiff's GAF scores as "other evidence," as discussed earlier at pp. 4, 6, there is absolutely no objective medical evidence to support any of the GAF scores in the myriad treatment records. The GAF scores were a moving target at best, changing daily depending on plaintiff's subjective complaints and the interpretation of those subjective complaints by different case workers. Considering plaintiff's GAF scores would have done nothing to rehabilitate the opinions in the MSS prepared by Ms. Mays.

For the reasons explained above, plaintiff's second claim of error is without merit.

### 3. Whether the ALJ Erred in Assessing the Credibility of Plaintiff's Statements (Doc. 14, pp. 21-24)

Plaintiff argues that the ALJ did not adequately evaluate and assess plaintiff's statements as required under SSR 97-7p. More particularly, plaintiff argues that the ALJ failed to make clear the weight accorded to Plaintiff's specific allegations and testimony, that he failed to consider significant evidence in his credibility analysis, and that he failed to provide any sound or reasonable basis for discrediting plaintiff's credibility.

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Cruse*, 502 F.3d at 542 (quoting *Jones*, 336 F.3d at 475). Moreover, the ALJ's credibility determination is accorded "great weight and deference . . . since the ALJ has the opportunity . . . of observing a witness's

demeanor while testifying." *Jones*, 336 F.3d at 476. Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 (SSA).

The ALJ's discussion pertaining to plaintiff's credibility is quoted below:

> At the hearing, the claimant alleged disability due to knee pain, lower back pain, general joint pain, frequent headaches with blurred vision, and pain in her neck causing limited mobility in her neck and arms. She estimated that she could sit about ten minutes and stand or walk about fifteen minutes. However, her medical history is not necessarily consistent with her allegation of disability.

(Doc. 10, pp. 19-20)(internal references to the record omitted)

> The claimant's testimony has been found to be less than credible. She stated that her back and joints hurt and ache every day; however, the extent of pain and limitation alleged is not supported by the record. After sitting in the hearing room without apparent difficulty or pain for about thirty minutes,[8] she estimated that she could only sit about ten minutes. Furthermore, the alleged tremors were not observed during the course of the hearing, nor was she wearing the bilateral wrist braces she reportedly needs.

(Doc. 10, p. 22)

As shown in the excerpts from his decision quoted above, the ALJ gave specific reasons for finding plaintiff less than credible. On review, the Magistrate Judge finds that the ALJ's credibility determination is amply supported by substantial evidence on the record. In short, the medical evidence of record is long instances of plaintiff seeking treatment for myriad subjective complaints but utterly devoid of any objective medical evidence that she actually suffered from any medically determinable physical or mental impairment, much less that those impairments were disabling.

---

[8] As established elsewhere in this R&R, plaintiff actually sat for more than an hour at the hearing.

For the reasons explained above, plaintiff's third claim of error is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (Doc. 14) be **DENIED,** and the Commissioner's decision **AFFIRMED.**

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 10th day of February, 2014.


/s/Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge